**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BUTTE DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

vs.

COREY DWAYNE GUSTAFSON,

Defendant.

CR 26-05-BU-WWM-2

ORDER DENYING MOTION TO SUPPRESS

On June 22, 2026, Defendant Gustafson ("Mr. Gustafson") filed a motion to suppress all evidence derived from the search of his white 1999 Chevrolet Tahoe. (Doc. 50). Mr. Gustafson is charged with one count of conspiracy to possess with intent to distribute methamphetamine and fentanyl, one count of possession with intent to distribute the same controlled substances, and one count of possession of a firearm in furtherance of a drug trafficking offense. (Doc. 1). The charges arise from a traffic stop conducted on January 12, 2025, and the subsequent search of Mr. Gustafson's vehicle. (Doc. 51).

Mr. Gustafson's motion sets forth two bases to suppress the evidence. First, Mr. Gustafson argues that the initial traffic stop was unlawful. (*Id.* at 6). Second, he asserts that the traffic stop was unduly prolonged beyond the time reasonably

required to complete the mission of the stop. (*Id.* at 6–7). The United States opposes the motion. It argues that law enforcement had reasonable suspicion to stop Mr. Gustafson's vehicle based on his failure to initiate his turn signal at least 100 feet before turning. (Doc. 56 at 7–8). The government also argues that law enforcement did not unreasonably prolong the traffic stop because they developed independent reasonable suspicion that Mr. Gustafson was involved in a felony theft case during the time that it took Mr. Gustafson to locate his proof of insurance in the course of the traffic stop. (*Id.* at 9–13). The Court held an evidentiary hearing on August 6th.

For the following reasons, the Court denies the motion.

## I. Factual Background

On January 9, 2025, the Best Buy location in Bozeman reported to law enforcement that an unknown individual had stolen between $3,000 and $5,000 in store merchandise over several days. (Doc. 51-1 at 1). Bozeman Police Officer Tommie Franscioni ("Officer Franscioni") responded to the report and reviewed the store's video surveillance. (*Id.*). Officer Franscioni was able to identify the individual pictured in the recordings as Mr. Gustafson based on his prior contacts with him. (*Id.*). Video surveillance further showed that Mr. Gustafson was driving

a 1999 white Chevrolet Tahoe bearing a Montana license plate number 649512D. (*Id.*).

A few days later, sometime before midnight on January 12th, Mr. Gustafson was at the Town Pump gas station in Bozeman on Baxter Lane and 19th Street. He testified that he pulled into a parking spot in front of the main entryway in his Chevrolet Tahoe. As he entered the gas station, he noticed a Bozeman Police Department patrol vehicle drive by his Tahoe, stop for a few seconds, and then drive away. Bozeman Police Officer Jon Salo ("Officer Salo"), who later pulled Mr. Gustafson over, testified that he did not recall being in the Town Pump parking lot, but he "very well could have been." Although Officer Salo did not recall being in the Town Pump parking lot, he testified that he "probably ran the plate" of Mr. Gustafson's vehicle. However, in the event that he did run the plate, he does not recall anything standing out about Mr. Gustafson's vehicle.

At around 11:30 p.m., Officer Salo and Bozeman Police Officer Braden Peterson ("Officer Peterson") initiated a traffic stop after observing Mr. Gustafson's white Chevrolet Tahoe, bearing plate number 649512D, turn south onto Sacco Drive from Baxter Lane without signaling 100 feet before the

intersection.[1] (Doc. 51-2 at 2; Gov. Exh. C). Mr. Gustafson disputes this fact. He testified that he turned on his blinker as he passed the Rocky Mountain Credit Union on Baxter Lane, approximately 430 feet before he completed the turn on Sacco Drive. In support of his position, Mr. Gustafson explained at the suppression hearing that he knew that police were following behind him and was therefore making a conscious effort to drive carefully. He also pointed to Officer Salo's body camera video to assert that his facial expression when informed of the reason for the stop was one of shock, as if he was surprised by someone telling him that he forgot to signal his turn.[2] At the time of the stop, however, Mr. Gustafson did not verbally dispute Officer Salo's claim about his failure to signal in time.

Mr. Gustafson turned again onto Tsasche Lane, this time Officer Salo activated his emergency lights and Mr. Gustafson pulled over to the side of the road. (Gov. Exh. C). Officer Salo approached the driver's side of the vehicle and

---

[1] Officer Salo's dashcam footage begins after the traffic violation, 30 seconds before he activated the vehicle's overhead lights. (Doc. 56 at 2; *see* Gov. Exh. C). Although the beginning of the dashcam footage depicts Mr. Gustafson using his turn signal to turn onto Tsasche Lane, the violation occurred before the recording began when Mr. Gustafson was traveling on Baxter Lane. (Doc. 51-2 at 2). Officer Salo explained at the suppression hearing that he initiated the stop on Tschache Lane rather than on Sacco Drive because of how narrow Sacco is and how a traffic stop there would have blocked any other cars from passing by.

[2] The bodycam footage that Mr. Gustafson points to is also lacking in that it does not make clear what he heard nor why he reacted in the way that he did. Furthermore, given that Officer Salo's allegation about the traffic infraction did not involve Mr. Gustafson's most recent turn, but an earlier one, he may have simply been surprised because of confusion about his alleged wrongdoing.

asked Mr. Gustafson whether anyone else was in the vehicle. (Gov. Exh. A, 11:30:03). After Mr. Gustafson confirmed that he was the only person in the vehicle, Officer Salo informed him, "the reason for the stop is [] that you didn't use your turn signal 100 feet prior on that turn back there." (*Id.* at 11:30:06–13). Officer Salo immediately requested his driver's license, proof of insurance, and registration. (*Id.* at 11:30:14–17).

As Mr. Gustafson began searching for his driver's license in his wallet, Officer Salo asked Mr. Gustafson where he was headed. (*Id.* at 11:30:21). Mr. Gustafson responded, "My buddy's house on Covered Wagon." (*Id.* at 11:30:23). Mr. Gustafson handed over his license and leaned over to retrieve his registration. (*Id.* at 11:30:46–59). Officer Salo asked, "What have you been up to tonight?" to which Mr. Gustafson responded, "Not much. I was at home for a little while." (*Id.* at 11:31:00–06). Mr. Gustafson produced his vehicle's registration and then informed Officer Salo that he would have to find a virtual copy of his proof of insurance on his cell phone because he did not have a physical copy of his new insurance card yet. (*Id.* at 11:31:30–59).

As Officer Salo waited for Mr. Gustafson to locate his insurance card on his cell phone, he noticed black goggles with an attached face mask sitting on Mr. Gustafson's dashboard. (*Id.* at 11:32:39). Officer Salo asked Mr. Gustafson about

the mask, and Mr. Gustafson explained that he bought it for airsoft, a hobby he was trying to pursue. (*Id.* at 11:32:40–52). Shortly after, Mr. Gustafson found an email that included his new insurance policy number and showed it to Officer Salo. (*Id.* at 11:33:08–14). Officer Salo informed Mr. Gustafson that he would be back and returned to his patrol car. (*Id.* at 11:33:15). Officer Salo called in Mr. Gustafson's license and registration information to dispatch. (*Id.* at 11:33:38–11:34:55). While he waited for a response from dispatch, Officer Salo, who was being trained by Officer Peterson, began reviewing his plan of action and what he had learned from his initial interaction. (*Id.* at 11:34:40–35:50).

During this time, Officer Salo's patrol sergeant told Officer Salo over the radio that Mr. Gustafson was the suspect in the Best Buy theft case. Soon thereafter, Bozeman Police Officer Kenneth Bridge ("Officer Bridge") arrived on the scene to assist in the traffic stop. (Doc. 51-1 at 1). Officer Bridge walked Officer Salo through how to check the computer system's bulletin for the information linking Mr. Gustafson to the thefts. (Gov. Exh. A, 11:35:50–36:42). Officer Salo asked whether the information in the bulletin was sufficient particularized suspicion to detain Mr. Gustafson and ask him about the thefts. 11:36:41–11:37:02). Officers Bridge and Peterson said no. (*Id.* at 11:36:59–37:03). Instead, the officers suggested he continue to verify Mr. Gustafson's

information while Officer Bridge "strike[s] up a conversation" with Mr. Gustafson and looks in the vehicle for any stolen items. (*Id.* at 11:37:20–34). Officer Bridge asked Officer Salo whether Mr. Gustafson had provided his proof of insurance; Officer Salo said he had not. (*Id.* at 11:37:37).

Officer Bridge approached Mr. Gustafson while Officers Salo and Peterson continued to wait for verification of Mr. Gustafson's information. After speaking with Mr. Gustafson for a moment, Officer Bridge noticed an axe in the vehicle within Mr. Gustafson's reach. (*See id.* at 11:43:39–44:17) (Officer Bridge explaining to Officer Salo that he removed Mr. Gustafson from the vehicle because of the location of the axe). Officer Bridge removed Mr. Gustafson from the vehicle and conducted a brief pat down. (*Id.* at 11:39:12–27). Officer Salo approached from his patrol car and assisted Officer Bridge in removing a pocket knife from Mr. Gustafson's front pocket. (*Id.*). Officer Bridge walked Mr. Gustafson over to the patrol car and left the driver door of Mr. Gustafson's vehicle open. (*Id.* at 11:39:28–50). Officer Peterson and Bozeman Police Sergeant Quinn Ellingson ("Sergeant Ellingson") remained at Mr. Gustafson's vehicle and peered inside the door and the back windows with their flashlights. (Gov. Exh. B,

12:39:55–40:42).[3] Officer Petersen asked whether Sergeant Ellingson knew what was stolen from Best Buy. (*Id.* at 12:39:58). Sergeant Ellingson said he used a baby stroller to cover the items and then carry them out of the store. (*Id.* at 12:40:00–16). Seconds later, Sergeant Ellingson looked in the rear driver's side window and observed a stroller. (*Id.*).

After the officers closed the door and returned to where Mr. Gustafson was sitting on the hood of the patrol car, Officers Bridge and Salo walked back to Mr. Gustafson's vehicle and Officer Bridge explained what he saw in the vehicle that caused him concern. (Gov. Exh. A, 11:40:40–43:38). Officer Bridge pointed out the axe handle, two cans of butane, several backpacks, two walkie talkies, the airsoft mask, a light bar, a Milwaukee drill, a battery pack, a charger, hunting equipment, a stroller, a gas can, a toolbox, tool bags, a lunch box, an electronic cooler, and a JBL speaker. (*Id.*). He noted that several of these items could potentially be stolen from Best Buy. (*Id.*).

While Officers Bridge and Salo looked in the windows of the vehicle, Officer Peterson spoke with Mr. Gustafson at the patrol car. (Gov. Exh. B, 12:40:51–12:44:19). He asked Mr. Gustafson where he was going that night. (*Id.*

[3] Officer Peterson's bodycam video clock was one hour ahead of the actual Mountain Standard Time, as reflected by the time stamps on Officer Salo's bodycam and the dashcam.

at 12:40:49–41:11). Mr. Gustafson responded that he was going to his friend's house and before that he was at home, at the Town Pump, and with his son. (*Id.*). Officer Peterson asked for the name of his friend that he was on his way to see and Mr. Gustafson responded, "Gabe Alvarado or Alvarez. He has a different last name on his Facebook than he does on his ID or whatever." (*Id.* at 12:41:14–29). After a few moments of silence, Mr. Gustafson offered, "That's a BB gun on the floorboard in the back." (*Id.* at 12:42:14–21). He confirmed that there was not anything else in the car that the officers needed to worry about and added that he got the BB gun from Murdoch's. (*Id.* at 12:42:22–36).

When Officers Bridge and Salo walked back to the patrol car, Mr. Gustafson told Officer Bridge that he had located his insurance card on his phone; fourteen minutes after the start of the traffic stop. (Gov. Exh. A, 11:44:20–29). Officer Bridge told him to wait there a little longer and they would be done as quickly as possible. (*Id.* at 11:44:30–37).

As they walked away, Officer Bridge asked Officer Salo whether there were any indicators of drug use in the vehicle, other than the butane cans. (*Id.* at 11:44:42–51). Officer Salo could not identify anything else, so Officer Bridge directed him to look up the name "Alvarez" on his computer system and search the results for someone who lives on Covered Wagon. (*Id.* at 11:44:51–45:56). The

bulletin results showed that Gabriel Alvarez, a co-defendant in this case, lived on Covered Wagon and had been involved in a drug deal "gone bad." (*Id.* at 11:46:30–47:22; 11:49:32). Next, Officer Salo searched for Mr. Gustafson's probation status and learned that he had a history of drug offenses and multiple theft charges. (*Id.* at 47:22–49:59; Doc. 51-1 at 1). Officer Salo noted that he felt a butane torch was not enough to conduct a search on the vehicle. (Gov. Exh. A, 11:49:21). In response, Officer Bridge listed the evidence they had collected so far: Mr. Gustafson was going to Covered Wagon to see a friend who was a subject in a drug deal gone bad, he was identified in the system as a drug offender, he had several bags in his car, and he was the suspect in the Best Buy thefts. (*Id.* at 11:49:26–50:00).

While Officers Bridge and Salo were discussing the evidence, Officer Peterson spoke with another officer about the items they spotted in the vehicle and determined they should read Mr. Gustafson his rights so they could ask him about the items. (Gov. Exh. B, 12:47:37–49:00). Officer Peterson informed Mr. Gustafson that he was not under arrest and read him his *Miranda* rights. (*Id.* at 12:49:09–46). Officer Peterson asked whether Mr. Gustafson still wanted to answer some questions after being informed of his rights, and Mr. Gustafson responded, "Sure." (*Id.*). He first asked Mr. Gustafson when he last visited Best

Buy and was told it had been 1 to 2 weeks prior. (*Id.* at 12:49:46–50:06). Officer Peterson asked if he bought anything while he was there. (*Id.* at 12:50:06–23). Mr. Gustafson claimed that he only bought a case for his son's Nintendo Switch. (*Id.*). When asked if he brought a baby stroller into the store, Mr. Gustafson answered, "Yeah. I think so." (*Id.* at 12:50:34–43). Officer Bridge asked him whether he stole anything and Mr. Gustafson said, "No." (*Id.* at 12:50:55–51:00).

Officer Peterson informed Mr. Gustafson that he was on camera "taking a bunch of stuff from Best Buy." (*Id.* at 12:51:00–08). He asked Mr. Gustafson what items he took. (*Id.*). Mr. Gustafson maintained that he could not remember stealing anything from Best Buy. (*Id.* at 12:51:13–44). However, when Sergeant Ellingson asked him if he remembered taking specific items, such as Galaxy earbuds, Mr. Gustafson admitted that he took the earbuds. (*Id.* at 12:52:19–39). Sergeant Ellingson asked about a multiple device "fast charger," and Mr. Gustafson said that was in his backpack in the vehicle. (*Id.* at 12:52:40–58). Mr. Gustafson further admitted to taking a Nintendo Switch, Sonos headphones, a Samsung projector, and a Lenovo tablet, but said all of those items were not in his vehicle anymore. (*Id.* at 12:53:12–55:08). He said that a few of the items were at his house, but he did not know where the rest were. (*Id.* at 55:45–56:10).

Sergeant Ellingson asked Mr. Gustafson if he would consent to a search of

his vehicle for the stolen items. (*Id.* at 12:56:29–57:02). Mr. Gustafson said they could only search the backpack on the passenger floorboard because the charger and the earbuds were in there. (*Id.*). When asked whether there was a reason he did not want his entire vehicle searched, Mr. Gustafson said he "would just prefer [the officers] don't search [the] whole vehicle." (*Id.* at 12:57:03–22). The officers discussed among themselves what to do next and decided that Officer Bridge would apply for a roadside warrant based on Mr. Gustafson's admission to stolen items being in the vehicle. (*Id.* at 12:57:51–1:02:45).

Officer Salo placed Mr. Gustafson under arrest and brought him to Sergeant Ellingson's patrol car. (*Id.* at 1:05:35–1:10:41). While conducting a search of Mr. Gustafson's person, Officer Peterson noted that Mr. Gustafson had a lot of cash in his pockets. (*Id.*). Officer Peterson told Officer Bridge that he was going to deploy his K-9, Stretch, for an exterior sniff of Mr. Gustafson's vehicle "for good measure" due to the cash that he felt was likely proceeds of drug sales. (*Id.* at 1:10:50–1:11:12). Before deploying Stretch, Officer Peterson asked Officer Salo to articulate what about Mr. Gustafson indicated that he was using drugs. (*Id.* at 1:14:09–15:20). Officers Salo and Peterson noted that Mr. Gustafson had "poor dental hygiene," "rigid body tone," pale skin color, sunken cheeks, and stuttered

when he spoke.[4] (*Id.*). Furthermore, Officer Peterson pointed out that Mr. Gustafson had butane cans, a butane torch, and several backpacks in his vehicle. (*Id.* at 1:14:55–15:21). He discussed how it is a person's right to refuse to consent to a search, but it becomes suspicious when they limit the search to a specific area or item, such as a backpack. (*Id.*).

Officer Peterson brought Stretch to Mr. Gustafson's vehicle for an exterior sniff. (*Id.* at 1:18:22–19:05). Stretch alerted to the presence of dangerous drugs on the driver's side within seconds. (*Id.*). Based on everything the officers witnessed during the traffic stop and Stretch's positive alert, Officer Bridge applied for a search warrant for any evidence of drug possession and theft within Mr. Gustafson's vehicle. (Doc. 51-2). The search warrant was issued by Montana District Court Judge Rienne McElyea at 1:36 a.m. on January 13th. (Doc. 51-3). Sergeant Ellingson, Officers Peterson, Salo, and Bridge conducted a search of the vehicle in which they found the following items:

> A camouflage backpack with two sets of binoculars, a night vision monocular, 2 battery banks, a trail camera, and a 4 wheeler key. Further, they located a 4k dash-cam, storage unit paperwork signed by Gustafson for Your Space Bozeman Storage, unit 483, located at 2264 Jackrabbit Lane, Bozeman, MT., a JBL boom box speaker, and a gun safe. Inside the gun safe, Officers found a large amount of a

[4] At the suppression hearing, Mr. Gustafson admitted to having used methamphetamine earlier in the day prior to the traffic stop, but he could not remember how much time had passed between him using the drug and getting in his car.

> crystalline substance consistent with methamphetamine in an approximately quart size plastic bag; spare jeweler's baggies; a digital scale; a straw; a measuring spoon; and another now empty quartsize plastic bag with residue. The bag with methamphetamine had marked a number consistent with measurement of an ounce (28.18gms), but was later found to weigh 24.8 grams. Also located inside the gun safe was a Springfield XD9 Semi-automatic handgun, which was altered and had the serial number removed/drilled out of the frame of the gun, as well as sanded/filed off the barrel.[5]

(Doc. 51-1 at 2).

Bozeman Police Detective Jake Ahmann ("Detective Ahmann") subsequently applied for search warrants for Mr. Gustafson's residence and storage unit. (Docs. 51-5, 51-6). Judge McElyea issued both search warrants. (Docs. 51-7, 51-8). Law enforcement seized a pipe filled with methamphetamine, a baggie with 1.2 grams of methamphetamine, and thousands of dollars' worth of stolen items from Mr. Gustafson's residence and storage unit. (Doc. 51-1 at 3).

Four days after the arrest, on January 16th, Bozeman police officers started playing a game during their shifts called "Bozeman Bingo." (Doc. 57 at 3). This game involved officers tracking events that occurred during their shifts on a bingo board, with boxes that included items such as arresting someone for DUI after 2:00

---

[5] Defense counsel made a point to emphasize that Officer Salo did not write a report recounting the traffic stop. Officer Salo testified that officers are not required by the department to write reports about every traffic stop made, and he did not do enough of significance to merit a report when the case was taken over by another officer. The accounting of items found within the vehicle comes from the report of Detective Ahmann.

a.m. or arresting three individuals riding in the same car. (Doc. 49-1). This game was short-lived, with department leadership instructing all officers to stop participating in it by January 28th. (Doc. 57 at 3).

## II. Legal Standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has repeatedly affirmed that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). A traffic stop is considered a "seizure" for purposes of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996). The reasonableness of a traffic stop is measured by the "totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

In order to effectuate the Fourth Amendment's protection, defendants have the right to have any evidence secured by means of an unlawful search and seizure excluded from trial, upon motion and proof. *Simmons v. United States*, 390 U.S. 377, 389 (1968) (citing *Weeks v. United States*, 232 U.S. 383 (1914)); Fed. R. Crim. P. 12(b)(3)(C). Characterized as "fruit of the poisonous tree," evidence seized as a result of an unlawful search or seizure is subject to exclusion unless it has been sufficiently "purged of the primary taint." *Wong Sun v. United States*,

371 U.S. 471, 485-88 (1963). A defendant has the ultimate burden of proof on a Fourth Amendment motion to suppress. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).

## III. Discussion

### *a. Reasonable Suspicion for the Traffic Stop*

Traffic stops are considered "reasonable under the Fourth Amendment if the officer reasonably suspects that a traffic violation has occurred." *United States v. Miranda-Guerena*, 445 F.3d 1233, 1236 (9th Cir. 2006). Law enforcement may also stop a vehicle upon reasonable suspicion that a person inside "has committed, is committing or is about to commit a crime." *United States v. Nault*, 41 F.4th 1073, 1079 (9th Cir. 2022). "Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form the basis for particularized suspicion." *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019) (cleaned up). This determination is based on the totality of the circumstances, with appropriate deference to the inferences drawn by the officer on the scene. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Valdes-Vega*, 738 F.3d 1074, 1077-79 (9th Cir. 2013) (en banc). Reasonable suspicion "is not a particularly high threshold to reach and is less than probable cause or a preponderance of evidence." *United States v. Taylor*, 60 F.4th

1233, 1241 (9th Cir. 2023) (internal citations and quotations omitted); *see also Arvizu*, 534 U.S. at 274 (stating reasonable suspicion falls "considerably short" of preponderance of the evidence).

An officer's "ulterior" or "actual motivations" do not undercut the constitutional reasonableness of traffic stops that are based on reasonable suspicion or probable cause. *Whren*, 517 U.S. at 811, 813. "[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent." *Id.* at 814; *see also United States v. King*, 244 F.3d 736, 738 (9th Cir. 2001) (holding that officers are permitted to conduct pretextual stops as a way to uncover other criminal activity only when the officer reasonably suspects that a traffic violation has occurred). In short, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813.

Where a law enforcement officer has executed a traffic stop, a citation need not be issued for the traffic violation in order for a traffic stop to be considered valid. *United States v. Willis*, 431 F.3d 709, 717 (9th Cir. 2005). In *Willis*, law enforcement began following the defendant's vehicle and ran its license plate after the vehicle made multiple rapid turns. *Id.* at 712. The officer discovered that the defendant's vehicle was listed as a "suspicious vehicle" and that a missing person's

report was associated with the vehicle. *Id.* The defendant entered an apartment complex and the officer waited in a nearby alleyway. *Id.* After the officer called for backup, the defendant left the apartment complex and made an illegal U-turn, causing the officers to box in the defendant's car, initiating a traffic stop. *Id.* The defendant stepped out of the vehicle and admitted to the officers that he had a firearm in his jacket pocket. *Id.* As a prohibited person, the defendant was charged with illegally possessing a firearm and he moved to suppress evidence of the firearm. *Id.* at 712–13.

The Ninth Circuit held that the defendant's traffic violations were sufficient to justify the stop, despite any delay between the first traffic violation—the rapid turn—and the eventual traffic stop. *Id.* at 715–16. The Ninth Circuit further stated that it "cannot second-guess the reasons for the officer's stop." *Id.* at 716 (citing *Whren*, 517 U.S. at 813, 816). Because the officer "could have relied on the traffic violation as a justification for stopping [the defendant], the stop was valid under *Whren*." *Id.* Lastly, the Court rejected the defendant's argument that the traffic stop is invalid because the officer "never mentioned any traffic violation or issued any traffic citation." *Id.* at 717 ("We think it was reasonable for the officers to view any traffic violations as inconsequential in light of [the defendant's] arrest").

Montana law and Bozeman's Code of Ordinances both require drivers to

signal continuously for at least 100 feet prior to turning a vehicle. Montana Code Annotated § 61-8-336 provides:

> A person may not turn a vehicle without giving an appropriate signal in the manner provided in this section. A signal of intention to turn right or left, other than when passing, must be given continuously during not less than the last 100 feet traveled by the vehicle before turning in any business district, residence district, or urban district.

Likewise, Bozeman's Code of Ordinances § 36.03.460(B) states: "A signal of intention to turn right or left when required shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning."

Here, Mr. Gustafson argues that Officers Salo and Peterson "did not have any basis" to initiate a traffic stop. (Doc. 51 at 7). He points out that "[o]ther than the officers' word, there is no evidence [he] failed to signal a turn." (*Id.* at 6). In fact, he testified that he signaled 430 feet prior to turning his vehicle. Conversely, Officer Salo testified that he witnessed Mr. Gustafson turn on his signal *as* he turned his vehicle, a distance significantly less than 100 feet. The government maintains that although the traffic violation was not captured on camera, Officers Salo and Peterson witnessed the infraction and initiated the traffic stop because of it. (Doc. 56 at 7–8). Moreover, the government effectively impeached Mr. Gustafson's credibility at the hearing by highlighting that he initially lied about stealing from Best Buy and admitted to using methamphetamine at some point on

the day that he was arrested. Lastly, it asserts that, similar to *Willis*, a traffic citation was unnecessary because upon Mr. Gustafson's arrest, "the traffic violation seem[ed] inconsequential." (*Id.* at 8).

Ultimately, the Court finds Officer Salo's testimony, given under oath, to be credible. Officer Peterson was training Officer Salo at the time and observing his actions and reactions. The Court finds it improbable that Officer Salo would have manufactured a false traffic violation during Officer Peterson's oversight of his performance while in training. Additionally, he reinforced his observation immediately upon pulling over Mr. Gustafson, telling him that the reason for the stop was because he did not use his turn signal 100 feet prior to the turn. On the other hand, Mr. Gustafson's testimony and recollection is undermined by the fact that he admitted to using methamphetamine earlier that day, a substance known to cause memory impairment. The Court is unwilling to accept Mr. Gustafson's version of the events over Officer Salo's.

Because the Court finds that Mr. Gustafson failed to use his turn signal 100 feet prior to turning, the traffic stop was reasonable under the Fourth Amendment. *See Miranda-Guerena*, 445 F.3d at 1236 (traffic stops are considered reasonable if the officer "reasonably suspects that a traffic violation has occurred"). It is inconsequential to the Court's determination of reasonableness whether Officer

Salo saw Mr. Gustafson's vehicle at the Town Pump and ran his plates. Because Officer Salo could have relied on the traffic violation as justification for stopping Mr. Gustafson, the stop was valid under *Whren*. *See Willis*, 431 F.3d at 716. Given the legitimacy of the initial traffic stop, the Court now turns to the remaining issue: whether the traffic stop was unlawfully prolonged.

*b. Independent Reasonable Suspicion to Prolong the Stop*

A traffic stop "can only last as long as is reasonably necessary to carry out the 'mission' of the stop, unless police have an independent reason to detain the motorist longer." *United States v. Gorman*, 859 F.3d 706, 714 (9th Cir. 2017). The "mission" of a traffic stop includes determining whether to issue a traffic ticket and "ordinary inquiries incident to the stop." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015); *see also Landeros*, 913 F.3d at 868; *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015). These inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. Police may order the driver to exit the vehicle, request identification, and ask questions about travel without exceeding the scope of a traffic stop. *Id.* at 356. In short, "[w]hen the police pull someone over for a traffic violation, the officer can obviously investigate that traffic infraction." *United*

*States v. Ramirez*, 98 F.4th 1141, 1143–44 (9th Cir. 2024).

An officer may also "take certain negligibly burdensome precautions in order to complete his mission safely," because officer safety "stems from the mission of the stop itself." *Rodriguez*, 575 U.S. at 356; *see also United States v. Hylton*, 30 F.4th 842, 848 (9th Cir. 2022) (finding criminal history checks to be a "negligibly burdensome precaution" necessary to complete the stop safely). However, the precaution must actually "advance officer safety." *Evans*, 786 F.3d at 787.

If a stop exceeds the time needed to "handle the matter for which the stop was made," then it violates the Fourth Amendment. *Rodriguez*, 575 U.S. at 350. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. There is no "de minimis" exception; any time added to a traffic stop that is unrelated to the mission is unlawful. *Landeros*, 913 F.3d at 867. Even so, police "may conduct certain unrelated checks" during a traffic stop, but they "may not do so in a way that prolongs the stop absent reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355. The Fourth Amendment thus tolerates investigations unrelated to the purpose of the stop, as long as they are done "*within* the time reasonably required to complete the stop's mission."

*Gorman*, 859 F.3d at 715 (citing *Rodriguez*, 575 U.S. at 355) (emphasis in original) (internal quotations omitted). The critical question is whether the check "prolongs—i.e. adds time to—the stop." *Rodriguez*, 575 U.S. at 357. Nevertheless, if police have reasonable suspicion of an independent offense, the traffic stop may be extended to investigate those matters. *Landeros*, 913 F.3d at 867.

The facts justifying a search or a stop must be "known to officers" at the time of the search or stop. *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) (internal citations omitted). Pursuant to the collective knowledge doctrine, the Court may aggregate the facts known to each law enforcement officer when determining whether reasonable suspicion existed if there is some level of communication among officers. *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007). This is a "limited requirement that there be a communication but not necessarily the conveyance of any actual information among officers." *Id.* at 1032–33. "Where law enforcement authorities are cooperating in an investigation, the knowledge of one is presumed shared by all." *Illinois v. Andreas*, 463 U.S. 765, 772 n. 5 (1983).

Here, Mr. Gustafson simply argues that the officers "unduly prolonged the traffic stop." (Doc. 51 at 6). In response, the government points out that it took

14 minutes for Mr. Gustafson to locate his insurance card. (Doc. 56 at 12). During that time, the officers learned that Mr. Gustafson was the suspect in the Best Buy theft and was alleged to have used a baby stroller to conceal stolen items. (*Id.*). The officers observed a stroller and electronics in plain view that further linked Mr. Gustafson to the theft. (*Id.*). The government asserts that the current theft allegation, the prior theft charges, and the items inside his vehicle gave the officers independent reasonable suspicion sufficient to justify questioning Mr. Gustafson about the theft. (*Id.*). Upon being questioned, the government points out that Mr. Gustafson initially lied before admitting to stealing several items when he was told that he was identified on video recordings. (*Id.* at 12–13) (citing *United States v. Urrieta*, 520 F.3d 569, 575 (6th Cir. 2008) (holding that a defendant's lies can support reasonable suspicion)). The government concludes that Mr. Gustafson's physical appearance, his limited consent to search, the presence of butane lighters, and his admission that he was going to visit Mr. Alvarez, all contributed to reasonable suspicion that dangerous drugs were located in the vehicle. (*Id.* at 13). Lastly, the government asserts that because the K-9 sniff occurred after Mr. Gustafson was arrested, it did not prolong the stop. (*Id.*).

The Court finds that the although the traffic stop was prolonged beyond the time necessary to "handle the matter for which the stop was made," *Rodriguez*, 575

U.S. at 350, law enforcement had independent reasonable suspicion that justified extending the stop. The mission of the traffic stop went uninterrupted for the first 14 minutes of the traffic stop, the time that it took Mr. Gustafson to locate his proof of insurance. At that point, the officers had already connected Mr. Gustafson to the Best Buy theft with sufficient reasonable suspicion to justify further investigation. First, Mr. Gustafson had been identified on Best Buy's video footage stealing merchandise. Furthermore, Mr. Gustafson was driving the same Chevrolet Tahoe that was seen driving away from Best Buy after the theft. A background check revealed that Mr. Gustafson had previously been convicted of theft charges. While waiting for verification of Mr. Gustafson's information, Officer Bridge noticed several items that connected him to the theft: several backpacks, two walkie talkies, a light bar, a battery pack, a charger, an electronic cooler, a JBL speaker, and a stroller. Sergeant Ellingson also located the baby stroller and noted that the Best Buy theft was carried out by placing the items in a covered stroller. All of these factors, taken together, were sufficient to confer reasonable suspicion that Mr. Gustafson was involved in the Best Buy theft, justifying further questioning.

Upon questioning Mr. Gustafson, officers developed additional reasonable suspicion that he was involved in drug activity. First, officers observed butane

cans, a butane torch, and several backpacks in Mr. Gustafson's vehicle. When officers asked for his consent to search his vehicle for the stolen Best Buy items, Mr. Gustafson limited his consent to a specific backpack and not the entire vehicle. Furthermore, Mr. Gustafson stated that he was on his way to visit Mr. Alvarez, an individual who was connected to illegal drug activity. Lastly, Mr. Gustafson had "poor dental hygiene," "rigid body tone," pale skin color, sunken cheeks, and stuttered when he spoke. Although Mr. Gustafson was ultimately arrested for the stolen items, any additional delay was supported by independent reasonable suspicion that Mr. Gustafson was involved in drug activity. Lastly, there was no delay caused by the dog sniff conducted on Mr. Gustafson's vehicle because it occurred after he was placed under arrest.

## IV. Conclusion

**IT IS HEREBY ORDERED** that Mr. Gustafson's Motion to Suppress (Doc. 50) is **DENIED**.

The Clerk of Court is directed to notify the parties of the making of this Order.

DATED this 8th day of September, 2026.

WILLIAM W. MERCER
UNITED STATES DISTRICT JUDGE